UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

REPORT AND RECOMMENDATION

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Michael J. Bailey,

Plaintiff,

vs.

County of Kittson, Kenny
Hultgren, Lou Ann Dalzell,
Steve Porter, City of Hallock,
Dale Hanson, Pennington
County, Michael Hruby,
James Van Schaick, City of
Thief River Falls, City of
Thief River Falls Chief of
Police, Gerald Hanson,
Charles Lindgren, Ryan Kezar,
Northwest Medical Center, Ellie
Wiemerslage, Mary McEnelly,
Timothy Rittenour, Marlene
Beedy, Nichole Weinen, Kathy
Mercil, Sharon Benson, Amanda
Peterson, Unknown Records
Department Personnel and
Unknown Persons,

Defendants.        Civ. No. 07-1939 (ADM/RLE)

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

I. <u>Introduction</u>

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the Motion of the City of Hallock, Dale Hanson ("D. Hanson"), the City of Thief River Falls, the City of Thief River Falls Police Chief Gerald Hanson ("G. Hanson"), Charles Lindgren ("Lindgren"), and Ryan Kezar ("Kezar")(collectively, the "City Defendants"), for Summary Judgment; and the Motion of Kittson County, Kenny Hultgren ("Hultgren"), Lou Ann Dalzell ("Dalzell"), Steve Porter ("Porter")(collectively, the "Kittson County Defendants"), and Pennington County, Michael Hruby ("Hruby"), and James Van Schaick ("Van Schaick")(collectively, the "Pennington County Defendants"), for Summary Judgment.

For these purposes, the Plaintiff appears <u>pro se</u>; the City Defendants appear by Jon K. Iverson, and Susan M. Tindal, Esqs.; and the Kittson and Pennington County Defendants appear by Roger L. Rowlette, and Jason M. Hill, Esqs.

For reasons which follow, we recommend that the Motion of the City Defendants for Summary Judgment be granted, and that the Motion for Summary Judgment of the Kittson and Pennington County Defendants be granted as well.

## II.  Factual and Procedural Background

On April 16, 2007, the Plaintiff commenced this action, by filing a Complaint seeking relief under Title 42 U.S.C. §1983, for alleged violations of his Federal constitutional rights.  See, Docket No. 1.  By way of brief background, in an Order dated March 31, 2008, the District Court, the Honorable Ann D. Montgomery presiding, granted, in part, the Motion of the City Defendants to Dismiss, and further granted, in part, the Motion of the Kittson and Pennington County Defendants to Dismiss, or for Summary Judgment.  See, Order, Docket No. 69.[1]  As a result, the District Court dismissed Counts One, Two, Three, Four, Five, Eight, Eleven, Twelve, Thirteen, Fourteen, and Fifteen, of the Plaintiff's Complaint.  Id. at p. 35.  The District Court further dismissed Counts Seven and Nine, to the extent that the Plaintiff asserted claims against the Defendants in their **official** capacities.  Id. at pp. 25-26. As a result, the sole remaining claims in this action are as follows:

---

[1]The District Court further granted the Motion of Marlene Beedy, Sharon Benson, Mary McEnelly, Kathy Mercil, Northwest Medical Center ("NWMC"), Amanda Peterson, Timothy Rittenour, Nichole Weinen, Ellie Wiemerslage, and Unknown Records Department Personnel (collectively, the "Medical Defendants"), to Dismiss, and denied the Plaintiff's Motion for Default Judgment, or for Summary Judgment, as well as the Plaintiff's Motions for Mistrial and for Sanctions, and for the Appointment of Counsel.  See, Order, Docket No. 69.

1.      Count Six:  First and Sixth Amendment claims against the Kittson County Defendants, in their individual and official capacities, for interference with the Plaintiff's legal mail;

2.      Count Seven: Fourteenth Amendment claim against the Kittson County Defendants, in their individual capacities, for deliberate indifference to the Plaintiff's need for Hepatitis C treatment;

3.      Count Nine: Fourteenth Amendment claim against the Kittson County Defendants, in their individual capacities, for deliberate indifference to the Plaintiff's need for dental treatment; and

4.      Count Ten: Fourth Amendment claim against the Kittson and Pennington County Defendants, and the City Defendants, in their individual and official capacities, for the use of excessive force in tasering the Plaintiff, and Fourth Amendment claim against the City Defendants, in their individual capacities, for the use of excessive force in physically restraining the Plaintiff.

Id. at pp. 16-18 (Count Six), 20-23 (Count Seven), 24-25 (Count Nine), 30-32 (Count Ten).

Turning to the undisputed facts, which underlie the Plaintiff's surviving claims, on

December 1, 2004, the Plaintiff was arrested on a felony charge of terroristic threats,

and he was held, as a pretrial detainee, in the Kittson County Jail (the "Jail") from

December 2, 2004, until June 14, 2005.[2]  See, <u>Complaint</u>, <u>Docket No. 1</u>, at ¶3, and

Exhibit F; see also, <u>State v. Bailey</u>, 2007 WL 1053011 at *1 (Minn.App., April 10,

2007), rev. denied (Minn., May 30, 2007).  All of the events, which are complained

of in the Plaintiff's Complaint, took place while he was a pretrial detainee.

A.    <u>The Plaintiff's Legal Mail</u>.

With respect to Count Six, the Plaintiff alleges that, during the course of

his detention at the Jail, Dalzell and Porter required the Plaintiff to submit all of his

correspondence, including letters to his criminal defense attorney, unsealed.  See,

<u>Complaint</u>, supra at ¶¶164-65.  The Plaintiff also alleges that he heard Dalzell read

aloud from that legal correspondence.  <u>Id.</u> at ¶38.  Lastly, the Plaintiff asserts that he

complained about that conduct to Hultgren, who was the Kittson County Sheriff, but

Hultgren ignored his complaints.  <u>Id.</u> at ¶¶33, 170.

For their part, the Kittson County Defendants have submitted the Affidavits of

Porter and Dalzell, in which they attest that they never ordered the Plaintiff to submit

his legal correspondence unsealed.  See, <u>Affidavit of Loann Dalzell ("Dalzell Aff.")</u>,

---

[2]During that time period, the Plaintiff was also physically housed at the
Pennington County Jail, and the Marshall County Jail, although he alleges that he was
in the continuous jurisdictional custody of Kittson County.  See, <u>Complaint</u>, <u>Docket
No. 1</u>, at p. 2 n. 2.

Docket No. 96, at ¶2;  Affidavit of Steve Porter ("Porter Aff."), Docket No. 95, at ¶3. In addition, Dalzell attests that she never read any of the Plaintiff's mail out loud, id. at ¶3, and Porter avers that he never heard Dalzell reading any of the Plaintiff's mail. See, Porter Aff., supra at ¶4.  Porter also attests that the Plaintiff never complained to him about his outgoing mail.  See, Porter Aff., supra at ¶¶4-5.  In turn, Hultgren states that he "do[es] not recall [the Plaintiff] lodging a complaint with regard to his outgoing legal mail," and he avers that, "[i]f [the Plaintiff] had lodged a complaint, I would have addressed the issue with [Dalzell] * * * ."  Affidavit of Kenny Hultgren ("Hultgren Aff."), Docket No. 97, at ¶2.

The Kittson County Defendants have also submitted a copy of the Jail's written policy concerning correspondence.  See, Affidavit of Jason M. Hill ("Hill Aff."), Docket No. 29, Exhibit A at p. 59.  The Policy states that "[i]nmates will be instructed that all outgoing mail of a **personal** nature is to be left unsealed so that it may be inspected by jail staff prior to its delivery to the U.S. Postal Service," while "[i]ncoming or outgoing mail between inmates and their attorney * * * will not be read or censored by staff," although incoming legal mail will be opened in the presence of the inmate, and inspected for contraband.  Id. [emphasis added]; see also,

- 6 -

Hill Aff., supra, Exhibit B at p. 9 (Inmate Handbook, which states that "[a]ll mail, not

legal communication, may be opened and reviewed for security purposes * * * .").

With respect to that policy, Dalzell and Hultgren attest as follows:

> Kittson County Jail staff do not read or censor incoming or
> outgoing legal mail.  Incoming legal mail is typically
> delivered to the inmate with only a brief visual inspection
> of the exterior of the envelope and without being opened.
> If incoming legal mail is opened, it is not read or censored
> by the staff, and it is opened in the presence of the inmate.
> Inmates are not instructed to leave outgoing legal mail
> unsealed.  Outgoing legal mail is typically received sealed
> from the inmate, and is sent out for delivery without being
> opened.  Outgoing legal mail that is unsealed is sealed by
> jail staff and sent out for delivery.

Hultgren Aff., supra at ¶3; Dalzell Aff., supra at 4.

In his unsworn response, the Plaintiff contends that Dalzell, Porter, and Hultgren, have

committed perjury, by submitting false Affidavits, and he reiterates the allegations of

his Complaint.  See, Plaintiff's Memorandum in Opposition, Docket No. 107, at pp.

3-5, 20-21, 35-36, 52-53.  In addition, the Plaintiff asserts that he "will subpoena

government officials, at trial by jury, with whom the Plaintiff was redressing [sic], and

wrote to concerning the interference with his legal mail to them, by these defendants

* * * ."  Id. at p. 52 n. 28.

As noted, the District Court previously concluded that, for purposes of

surviving a Motion to Dismiss, the Plaintiff had sufficiently alleged that the Kittson

County Jail Policy, concerning the screening of outgoing legal mail, is unconstitutional, and that the Kittson County Defendants impermissibly read his legal mail. See, Order, Docket No. 69, at pp. 17-18.

B.    The Plaintiff's Medical Treatment.

With respect to Count Seven, the Plaintiff alleges that the Kittson County Defendants denied him medical treatment, while he was held as a pretrial detainee at the Jail. He alleges that he was diagnosed with Hepatitis C in 2000, and that he was prescribed medication prior to his arrest, but that the Kittson County Defendants refused to allow him to take those medications while he was detained at the Jail. See, Complaint, supra at ¶¶171(B), 172.

As a result of that delay in treatment, the Plaintiff alleges that he suffered severe pain, and other serious side-effects. Id. at ¶171(B). In support of his claim, the Plaintiff has submitted a letter from Kamrin Macki, FNP-C ("Macki"), of Altru Health Systems, in Grand Forks, North Dakota. Id., Exhibit D. In that letter, which is dated August 17, 2004 -- several months prior to the Plaintiff's arrest and detention -- Macki states as follows:

> I did consult with a hepatologist at the Mayo Clinic. We will treat you with a combination of pegylated Interferon [peginterferon] and Ribavirin for a full year.

> I have enclosed a prescription.  When you receive the medication from your pharmacy, **please contact my office and we will arrange for an appointment for instruction on the medication administration.**

Id. [emphasis added].[3]

In December of 2004, when the Plaintiff was initially booked at the Jail, he had both peginterferon, and Ribavirin, in his possession.  See, Hill Aff., supra, Exhibit C at pp. 3-4.  Booking Sheets, which have been submitted by the Kittson County Defendants, disclose that, when the Plaintiff was initially booked into the Jail on December 2, 2004, he stated that he was taking medications for Hepatitis C, see, id., Exhibit C at p. 3, while, on subsequent Booking Sheets, from February 16, 2005, June 13, 2005, and July 11, 2005, the Plaintiff is reported as not taking any medications.  Id., Exhibits E, F, and G.  The Plaintiff alleges that, on February 22, 2005, he "went to Court," to get a Court Order to start his prescribed treatment, "but all he got was an order to transport to Grand Forks to Altru Clinic[.]"  Complaint, supra at ¶171(B).  According

---

[3]Pegylated Interferon, or peginterferon, is "indicated for use alone or in combination with * * * ribavirin * * * for the treatment of chronic hepatitis C in patients with compensated liver disease."  Physician's Desk Reference, at p. 2995 (62nd ed. 2008).

Ribavirin is "indicated in combination with * * * peginterferon * * * Injection for the treatment of chronic hepatitis C in patients with compensated liver disease."  Id. at p. 3018.

to the Complaint, the transport never occurred.  Id. at ¶171(B) and Exhibit A (Waiver of Extradition, dated February 22, 2005).

In response to those allegations, Dalzell attests that, when the Plaintiff was booked into the Jail on December 2, 2004, she contacted his treating physician, Dr. Chu, at the Altru Clinic, concerning his Hepatitis C diagnosis.  See, Dalzell Aff., supra at ¶5.  A nurse informed Dalzell that the Plaintiff's criminal defense attorney, Loretta Hillier ("Hillier"), had requested the Plaintiff's medical records.  Id.  Shortly thereafter, Hillier contacted Dalzell, and advised that she had spoken with the Plaintiff's nurse at the Altru Clinic.  Id.  Hillier further advised that the Plaintiff would not be starting his Hepatitis C medications "because Mr. Bailey had lied and had stated that he had been taking the medications prior to his incarceration in Kittson County."  Id.  Hillier told Dalzell "that Mr. Bailey would require blood work and would need to treat [sic] with his treating physician prior to starting the medications," and that the Plaintiff should not start the medications until he was released from jail. Id.  At Hillier's request, Dalzell arranged a telephone call between Hillier and the Plaintiff, so that Hillier could inform the Plaintiff of his physician's recommendations. Id.

Nearly two (2) weeks later, on December 14, 2004, Dalzell received a note from the Altru Clinic, which directed that the Plaintiff was to start "a medication Pegasus for treatment of Hepatitis C," and which included instructions for follow-up visits. Id. at ¶6; see also, Affidavit of Roger L. Rowlette ("Rowlette Aff."), Docket No. 99, Exhibit L.  However, less than one (1) week later, Hillier contacted Dalzell to advise that Dr. Chu had "changed his mind," and that he wanted to meet with the Plaintiff before beginning any treatment.  Id.; see also, Rowlette Aff., supra, Exhibit M (Memorandum of telephone call between Dalzell and Hillier)  Accordingly, the Plaintiff was scheduled for an appointment with Dr. Chu on January 12, 2005.  Id. However, on December 29, 2004, the Plaintiff was involved in an incident at the Jail and the Northwest Medical Center ("NWMC"), which resulted in his removal from the Jail until February 16, 2005, as described more fully below.  Id.  As a result, the Plaintiff did not attend his appointment on January 12, 2005.  Id.

On February 16, 2005, the Plaintiff returned to the Jail, but Dalzell, Hultgren, and Porter, attest that the Plaintiff did not make any further request for Hepatitis C treatment, although he made several unrelated requests for medical treatment.  Id. at ¶7 and Exhibits B and C; see also, Hultgren Aff., supra at ¶¶8, 13; Porter Aff., supra at ¶6. Specifically, the Plaintiff complained that his nose had been broken, during the

incident which occurred on December 29, 2004.  See, <u>Hultgren Aff.</u>, supra, Exhibits

E and G.  Accordingly, on February 18, 2005, the Plaintiff was taken to a medical

appointment, with Roland Larter, M.D. ("Dr. Larter"), at the Kittson Memorial

Healthcare Center ("Kittson Memorial").  See, <u>Rowlette Aff.</u>, supra at Exhibit N.

However, the Plaintiff was dissatisfied with the outcome of that appointment, based

upon his belief that Dr. Larter was "only interested in disproving that [his] nose

(septum) was broken or 'diviated' [sic] in Thief River Falls."  <u>Hultgren Aff.</u>, supra,

Exhibit E (Letter from the Plaintiff to Hultgren).

According to Dalzell, on February 21, 2005, the Plaintiff again complained of

a bloody nose, swelling in his legs, shortness of breath, and a cough.  <u>Id.</u> at ¶7; see

also, <u>Hultgren Aff.</u>, supra, Exhibits E and G.  The Plaintiff "specifically requested that

he be taken to the 'Hallock Clinic,' or Kittson Memorial Healthcare Center" -- i.e., not

to the Altru Clinic in Grand Forks, North Dakota -- "for an appointment to see his

'primary care provider' Jason Nupdal or 'Dr. See.'"  <u>Hultgren Aff.</u>, supra at ¶4 and

Exhibit E.  The Plaintiff did not request any treatment for Hepatitis C.  <u>Id.</u>

The next day, during his appearance in Kittson County District Court, the

Plaintiff again requested a medical appointment, and the Court authorized the Kittson

County Sheriff to transport the Plaintiff to Grand Forks, North Dakota, for a medical

appointment, on the condition that law enforcement remain present during the course of the appointment. Id., Exhibit F (Court Minutes). The Plaintiff signed a Waiver of Extradition for the purpose of traveling to and from any such appointment. Id. However, there is no evidence, in this Record, that the Plaintiff had a medical appointment at the Altru Clinic for Hepatitis C treatment, or otherwise. In fact, in his responsive memorandum, the Plaintiff purports to quote from a transcript of the Hearing, which was conducted by the Kittson County District Court.[4] See, Plaintiff's Memorandum in Opposition, supra at 39. As quoted by the Plaintiff, Hillier advised the Court that the Plaintiff did **not** have any previously scheduled medical appointments in Grand Forks, North Dakota -- instead, she advised that "they haven't been made yet, but we'll make them." Id.

Thereafter, on March 4, 2005, and pursuant to his earlier request, the Plaintiff was transported to Kittson Memorial, where he was seen by Jason Nupdal ("Nupdal"), a nurse practitioner. See, Dalzell Aff., supra at ¶7 and Exhibit B. During the appointment, the Plaintiff did not request any Hepatitis C treatment, and blood tests disclosed that his liver enzymes were stable. Id. Nupdal prescribed a nasal steroid spray, TED socks, increased fluid intake, exercise, and deep breathing to alleviate the

---

[4]No official transcript has been submitted for our review.

Plaintiff's other complaints, id., and he approved the Plaintiff's re-admission to the Jail. Id., Exhibit C. The Plaintiff immediately received the nasal steroid spray, and Jail records disclose that the Plaintiff also received the TED socks which were prescribed, and that he had access to a stationary bicycle for exercise. Id. at ¶8; Hultgren Aff., supra, Exhibits H and I; Rowlette Aff., supra, Exhibit O.

Porter attests that he "never received a complaint from Mr. Bailey with regard to his medical treatment, and [that he] never denied any medical treatment to Mr. Bailey." Porter Aff., supra at ¶6. Porter also attests that he never threatened the Plaintiff with isolation, physical harm, or transfer, with respect to any request for medical treatment. Id. at ¶7. Dalzell similarly attests that, if the Plaintiff had requested an appointment for his Hepatitis C treatment, after his return to the Jail, she would have contacted either his attorney, or his treating physician, see, Dalzell Aff., supra at ¶9, and Hultgren attests that he would have "ensured that [the Plaintiff] was taken to see his treating physician" for Hepatitis C treatment, had such a request been made. See, Hultgren Aff., supra at ¶8. Hultgren also states that, although the Plaintiff submitted several letters in which he complains about health concerns, the Plaintiff did not complain to Hultgren about a denial of Hepatitis C treatment. Id. at ¶¶7, 12-

13.  In fact, on April 1, 2005, the Plaintiff informed a deputy sheriff that his general condition was "just fine."  Id. at Exhibit H.

As noted, the Plaintiff alleges that the Kittson County Defendants were deliberately indifferent to his serious medical needs, based upon their failure to provide his Hepatitis C medications.  See, Complaint, supra at ¶¶171(B), 172; Plaintiff's Memorandum in Opposition, supra at 25, 46-47; see also, Order, Docket No. 69, at 20-23 (finding that a genuine issue of material fact, concerning the Plaintiff's need for Hepatitis medications, precluded Summary Judgment).  He now alleges that he made near-daily complaints, about his Hepatitis C treatment, to numerous staff members at the Jail, until December 29, 2004.  See, Plaintiff's Memorandum in Opposition, supra at 21.  However, the Plaintiff also alleges that he stopped requesting Hepatitis C treatment, after his return to the Jail on February 16, 2005, "because his complaints, references and requests were previously summarily denied."  Id. at 37.

C.    The Plaintiff's Dental Treatment.

With respect to Count Nine, the Plaintiff alleges that the Kittson County Defendants refused to transport him to a dental appointment, which had been scheduled prior to his arrest, in order to obtain dentures.  See, Complaint, supra at

¶171(D).  As a result of that delay in treatment, the Plaintiff alleges that he suffered injuries to his mouth, including a deteriorated bone structure, and burns, abrasions, and lacerations, to his gums and esophagus, due to his inability to chew his food.  Id.

In his unsworn response, the Plaintiff further alleges that Porter was present when the Plaintiff "showed documentary proof" of his dental appointment to Hultgren.  See, Plaintiff's Memorandum in Opposition, supra at 4, 53.  The Plaintiff also contends that he made several complaints, about his dental appointment, "to virtually every Deputy Sheriff and Sheriff," id. at 21, but that Hultgren and Dalzell, in particular, refused to transport him to that appointment.  Id. at 42-43, 53.[5]  In fact, he alleges that Hultgren "took the appointment slip from the Plaintiff, saying he would return it, but never did."  Id. at 43.  The Plaintiff further contends that he often choked on his food, due to his lack of teeth, and the resultant inability to chew, and that the "defendants were well aware of the Plaintiff choking, by not only the Plaintiff telling them, but also by the monitors in the cell."  Id. at 24, 42.

In response, the Kittson County Defendants attest that the Plaintiff only made one (1) complaint concerning any dental problems, on February 19, 2005, when he

---

[5]Inexplicably, the Plaintiff also alleges that he "did **not** go to defendant Dalzell with the dental appointment, because she had repeatedly demonstrated deliberate indifference to medical needs * * * ."  Plaintiff's Memorandum in Opposition, supra at 51 [emphasis added].

requested that his waffles be placed in a microwave, in order to soften them, due to his lack of teeth.  See, <u>Rowlette Aff.</u>, supra, Exhibit P; see also, <u>Dalzell Aff.</u>, supra at ¶10; <u>Hultgren Aff.</u>, supra at ¶11.  Dalzell and Hultgren further attest that the Plaintiff never requested a dental appointment, nor did he complain of pain while eating, or of burns, abrasions, or lacerations to his gums.  See, <u>Dalzell Aff.</u>, supra at ¶10; <u>Hultgren Aff.</u>, supra at ¶11.  Lastly, Dalzell and Hultgren aver that the Plaintiff was never seen spitting blood after eating.  <u>Id.</u>; <u>Hultgren Aff.</u>, supra at ¶11.

As we have noted, the Plaintiff alleges that the Kittson County Defendants were deliberately indifferent to his need for dental care, based upon his unsupported assertion that the Defendants knew of an alleged dental appointment, and that they knew of his difficulty with eating.  See, <u>Complaint</u>, supra at ¶171(D); <u>Plaintiff's Memorandum in Opposition</u>, supra at 25; see also, <u>Order</u>, <u>Docket No. 69</u>, at 24-25 (finding that a genuine issue of material fact, concerning the Plaintiff's need for dentures, precluded Summary Judgment).

D.     The Events of December 29, 2004.

With respect to Count Ten, the Plaintiff contends that several of the Defendants used excessive force, during the course of an incident that occurred on December 29, 2004.  See, Complaint, supra at ¶¶188-198.  On that morning, just before 11:00 o'clock a.m., Jolene Lindegard ("Lindegard"), who is an advocate with Kittson County Victim Services, stopped to speak with Joey Arnal ("Arnal"), who was the Plaintiff's cell mate.  See, Rowlette Aff., supra, Exhibit Q.  While Lindegard was speaking with Arnal, she observed the Plaintiff "waving his arms and talking in an angry voice saying 'F*ck this * * * .'"  Id.  Lindegard reported the Plaintiff's behavior to Dalzell, and then to Porter.  Id.  In her Affidavit, Dalzell attests that she also observed the Plaintiff "hollering and swearing profusely," while "yelling, 'He's a f*cking liar, she's a f*cking liar,' and waving his hands in the air."  Dalzell Aff., supra at ¶11 and Exhibit D.  For his part, the Plaintiff contends that Dalzell and Porter "deliberately lied about the Plaintiff's involvement in an alleged disturbance on December 28, 2004," in order to provoke him.  See, Plaintiff's Memorandum in Opposition, supra at 6.

Within a few minutes, Porter arrived at the Plaintiff's cell, and asked him to calm down, but Porter attests that the Plaintiff "continued screaming, 'F*ck you.'"

Porter Aff., supra at ¶8; Dalzell Aff., supra, Exhibit D.   Porter then advised the

Plaintiff that he could not remain in his cell with Arnal, so long as he remained angry

and violent, and Porter further advised that, if the Plaintiff's behavior continued, "he

would be taken to Northwest Medical Center to be examined."   Id.   Porter then

directed the Plaintiff to hold out his wrists for handcuffing, but the Plaintiff replied,

"F*ck you[;] [s]tay away from me."   Id. at ¶9; see also, Dalzell Aff., supra at ¶11 and

Exhibit D.   However, the Plaintiff eventually cooperated.   Id.[6]

Nonetheless, because the Plaintiff had exhibited such a dramatic change in his

behavior, Porter determined that the Plaintiff should be hospitalized, on an emergency

basis, in order to secure a mental health evaluation, and for the protection of the

---

[6]For his part, the Plaintiff alleges that Porter approached the Plaintiff and asked him what was wrong, and the Plaintiff replied "you're a f*cking liar."   Complaint, supra at ¶240.  The Plaintiff further alleges that Porter then entered the Plaintiff's cell, sat down next to the Plaintiff on his bed, and grabbed his arm.  Id. at ¶241.  The Plaintiff moved away from Porter, and told him to "stay away from me," and Porter left the cell.  Id.  The Plaintiff alleges that Porter then returned to his cell, asked the Plaintiff if he needed to be taken to the "third floor," and informed the Plaintiff that he had to submit to being handcuffed, or Porter would use pepper spray on him.  Id. at ¶¶245-46.  The Plaintiff contends that Porter did not mention the NWMC, and he further contends that he did not understand what he characterizes as Porter's oblique reference to the "third floor."  See, Plaintiff's Memorandum in Opposition, supra at 7.

Plaintiff, the other prisoners, and Jail staff. Id. at ¶10. Accordingly, Dalzell contacted the NWMC to secure a room for the Plaintiff. See, Dalzell Aff., supra at ¶11.[7]

Shortly thereafter, at approximately 11:49 o'clock a.m., Porter, D. Hanson, and the Plaintiff, left the Jail for the trip to the NWMC, and Porter avers that the Plaintiff was cooperative throughout that transport. See, Porter Aff., supra at ¶11.[8] Upon their arrival at the NWMC, Porter completed an Application by Peace or Health Officer for Emergency Hospitalization, based upon his observations of, and interactions with, the Plaintiff. Id. at ¶12 and Exhibit A.[9] However, because the Plaintiff had been cooperative over the period of approximately one (1) hour, D. Hanson removed the

---

[7]Porter attests that the NWMC is the closest facility which conducts mental health evaluations of prisoners, but that it is more than an hour's drive from the Jail. See, Porter Aff., supra at ¶10.

[8]Porter requested D. Hanson's assistance for the transport. See, Porter Aff., supra at ¶11; Affidavit of Dale Hanson ("D. Hanson Aff."), Docket No. 86, at ¶2 and Exhibit A. In his Affidavit, D. Hanson avers that he is familiar with the Plaintiff from previous interactions, and that he knows the Plaintiff to be an "individual who will not obey law enforcement and may harm them." D. Hanson Aff., supra at ¶2.

[9]The Plaintiff contends that his behavior did not warrant hospitalization, and he further contends that Porter lied on the Application, see, Plaintiff's Memorandum in Opposition, supra at 9 -- an allegation which Porter flatly denies in his sworn Affidavit. See, Porter Aff., supra at ¶12. Nonetheless, the Plaintiff contends that he could have "prove[d] the falsity of these reports and affidavits through independent witnesses," if we had granted his Motion to appoint counsel. See, Plaintiff's Memorandum in Opposition, supra at 11.

Plaintiff's handcuffs.  Id. at ¶13; Affidavit of Dale Hanson ("D. Hanson Aff."), Docket No. 86, at ¶3 and Exhibit A.  According to Porter and D. Hanson, the Plaintiff immediately "became very angry, non-cooperative, [and] began throwing items across the room and called the nurses 'f*cking b*tches.'"  Id.; D. Hanson Aff., supra at ¶3 and Exhibit A.  In his response, the Plaintiff denies throwing any items.  See, Plaintiff's Memorandum in Opposition, supra at 12.

At that point, the Plaintiff was escorted to a secure room, which contained only a mattress, with Porter and D. Hanson positioned between the Plaintiff and the hospital staff, who remained outside the room.  See, Porter Aff., supra at ¶14; see also, Affidavit of James Van Schaick ("Van Schaik Aff."), Docket No. 98, at ¶6.  The Plaintiff continued "swearing and throwing his arms around," but eventually complied with Porter's request to change into the hospital's paper pajamas.  Id.; D. Hanson Aff., supra at ¶4 and Exhibit A.  However, the Plaintiff stated that no one was going to give him any medication, see, D. Hanson Aff., supra at ¶4 and Exhibit A, and Porter attests that the Plaintiff "continued to swear at the nurses," and "threw his clothes and slippers out of the door * * * ."  Porter Aff., supra at ¶14.

According to Porter and D. Hanson, the hospital staff determined that the Plaintiff needed to be medicated, in order to subdue his behavior, and the hospital staff

contacted local police for additional support.  Id. at ¶15; D. Hanson Aff., supra at ¶5;

see also, Complaint, supra, Exhibit K.  Porter told the Plaintiff to calm down, so that

he could receive medication, and he advised the Plaintiff that "no one wanted to

wrestle with him due to his Hepatitis C diagnosis."  Id.  Nonetheless, several of the

Defendants attest that the Plaintiff "refused to cooperate and stated that if any cops

came near him he would bite them and spit in their eyes."  Id.; D. Hanson Aff., supra

at ¶5 and Exhibit A; Affidavit of Charles Lindgren ("Lindgren Aff."), Docket No. 87,

at ¶2; Affidavit of Ryan Kezar ("Kezar Aff."), Docket No. 88, at ¶1.[10]

By that time, at approximately 12:55 o'clock p.m., Van Schaick, and the City

Defendants, had arrived, in response to the hospital's request for back-up, including

its specific request for an officer with a taser gun.  See, Van Schaick Aff., supra at ¶2;

D. Hanson Aff., supra at ¶5; Kezar Aff., supra at ¶1; Lindgren Aff., supra at ¶2;

Affidavit of Gerald Hanson ("G. Hanson Aff."), Docket No. 89, at ¶2.  Van Schaick

attests that, at the time of that call, he was the only Deputy Sheriff on duty, and in

possession of a taser gun.  Id.  Upon his arrival, Van Schaick joined Porter and D.

Hanson in the secure room, with the Plaintiff.  See, Porter Aff., supra at ¶17; Van

---

[10]For his part, the Plaintiff first denies threatening to bite or spit at anyone, see, Plaintiff's Memorandum in Opposition, supra at 15, but he then apparently admits making those threats.  Id. at 30.

Schaick Aff., supra at ¶2.  The other officers remained outside of the room.  See, Kezar Aff., supra at ¶2; Lindgren Aff., supra at ¶2.

Porter and Van Schaick used verbal commands, in an effort to gain control of the Plaintiff, including "ordering him to roll over on to his stomach and comply with the nursing staff," and warning "that [Van Schaick] would deploy the taser if [the Plaintiff] did not comply." Porter Aff., supra at ¶18; Van Schaick Aff., supra at ¶¶4-5; D. Hanson Aff., supra, Exhibit A; Lindgren Aff., supra at ¶2.  Nonetheless, the Plaintiff "continued to swear and yell and refused to cooperate," and further refused any medication.  Id.; Van Schaick Aff., supra at ¶4; D. Hanson Aff., supra at ¶5 and Exhibit A.  The Plaintiff contends that he was calm, that he "was within his rights to defend his bodily and mental integrity," and that "he sat down on the mattress to further show a calm demeanor[.]"  Plaintiff's Memorandum in Opposition, supra at 15.  He acknowledges that Van Schaick directed him to roll onto his stomach, but he both denies, and admits, that he was warned that he would be tased, id. at 19, 31, although he contends that it was more of a "threat" than a warning.

Because of the Plaintiff's Hepatitis C diagnosis, his behavior, and his ongoing threats to infect law enforcement, Porter and Van Schaick determined that the Plaintiff could not be controlled through physical force, by way of hands-on techniques.  See,

Porter Aff., supra at ¶¶16, 19; Van Schaick Aff., supra at ¶5.   Accordingly, Van

Schaick activated the taser gun, and twice ordered the Plaintiff to lie down on his

stomach on the mattress.   See, Van Schaick Aff., supra at ¶6; Porter Aff., supra at ¶18;

D. Hanson Aff., supra at ¶5.   The Plaintiff refused to comply, so Van Schaick

deployed the taser, while standing approximately seven (7) to eight (8) feet from the

Plaintiff.   Id. at ¶¶6-7; Porter Aff., supra at ¶18; D. Hanson Aff., supra at ¶5.   The

Plaintiff contends that "[n]o one had to wrestle with, shoot with a taser gun, and/or

forcibly medicate the Plaintiff, all these defendants **needed to do** was, as the Plaintiff

requested, 'leave me alone.'"   Plaintiff's Memorandum in Opposition, supra at 16

[emphasis in original].   However, he apparently admits that Van Schaick directed him

to roll over onto his stomach, and he admits that he refused to "cooperate in or allow

the administration of dangerous drugs[.]"   Id. at 18.

   According to Van Schaick, one (1) dart caught the fabric of the Plaintiff's shirt,

but did not make contact with his skin.   See, Van Schaick Aff., supra at ¶7.   The

second dart embedded in the Plaintiff's abdomen, and Van Schaick fired the taser gun

for one (1) cycle, lasting five (5) seconds.   Id.   After Van Schaick fired the taser gun,

G. Hanson, Kezar, and Lindgren, entered the room, and assisted the Plaintiff onto the

mattress, as individuals who are tased become very rigid.   Id.; Porter Aff., supra at

- 24 -

¶18; <u>D. Hanson Aff.</u>, supra at ¶5 and Exhibit A.  In a contemporaneous report, D. Hanson stated that G. Hanson, Kezar, and Lindgren, held the Plaintiff down, while NWMC staff administered two (2) injections.  See, <u>Complaint</u>, supra, Exhibit E. However, G. Hanson, Kezar, and Lindgren, attest that they did not jump on the Plaintiff, nor did they use any force to take the Plaintiff to the mattress.  See, <u>G. Hanson Aff.</u>, supra at ¶¶3-5; <u>Kezar Aff.</u>, supra at ¶¶3-4; <u>Lindgren Aff.</u>, supra at ¶4.

Kezar and Lindgren further attest that the Plaintiff did not complain of any injuries, after being tased, or after being lowered to the mattress.  See, <u>Kezar Aff.</u>, supra at ¶5; <u>Lindgren Aff.</u>, supra at ¶5.  Van Schaik also attests that, immediately after being tased, the Plaintiff "chuckled and made light of the incident, stating something to the effect of '[t]hat stopped me.'"  <u>Van Schaick Aff.</u>, supra at ¶10.  In contrast to the sworn Affidavits of the Defendants, the Plaintiff alleges that G. Hanson, Kezar, and Lindgren, physically assaulted him, resulting in a broken nose, a sprained neck and back, but that his injuries were not apparent until the next day because he was "unconscious."  See, <u>Plaintiff's Memorandum in Opposition</u>, supra at 19.  He also alleges that one (1) of the officers held a forearm across his nose, cheek, and jaw.  <u>Id.</u> at 33.  However, the Plaintiff has not alleged any injuries as a result of being tased.

In his contemporaneous report of the incident, Van Schaick states that the Plaintiff began to cooperate with law enforcement, after being tased.  See, <u>Van Schaick Aff.</u>, supra, Exhibit K.  In fact, Van Schaick attests that immediately after being tased, the Plaintiff "chuckled and made light of the incident, stating something to the effect of 'That stopped me.'"  <u>Id.</u> at ¶10.  As noted above, once law enforcement had gained control of the Plaintiff, nurses removed the dart from his abdomen, and then administered two (2) injections, pursuant to the direction of Timothy Rittenour, M.D. ("Dr. Rittenour").  <u>Id.</u>, Exhibit K; <u>D. Hanson Aff.</u>, supra at ¶5.  Van Schaick attests that, other than the incident of December 29, 2004, he has not had any contact with the Plaintiff.  <u>Id.</u> at ¶8.

In his Affidavit, Van Schaick swears that he has received training on the use of force on a number of occasions, and that he has served as an instructor for such training.  <u>Id.</u> at ¶9.  Based upon his training, Van Schaick avers that the use of a taser gun, as non-deadly force, was appropriate, given the Plaintiff's threats of great bodily harm to law enforcement, and given that his medical condition, and threats of infection, precluded the use of hands-on methods of force, in order to ensure the safety of the officers.  <u>Id.</u> at ¶9.  In response, the Plaintiff argues that he was tased solely "to facilitate the illegal administration of dangerous antipsychotic and anesthesia drugs,

- 26 -

without consent and without a court order," and not to ensure the safety of the Plaintiff, the officers, or the hospital staff.   See, <u>Plaintiff's Memorandum in Opposition</u>, supra at 32-33.

Ultimately, on December 30, 2004, the Plaintiff was discharged from the NWMC, to a jail, although not to the Kittson County Jail.  See, <u>Complaint</u>, supra, Exhibit J; <u>Hultgren Aff.</u>, supra at ¶4.  The discharge report notes that no psychiatric symptoms were observed by the NWMC staff, during the course of the Plaintiff's hospitalization.  <u>Id.</u>

As noted, the District Court previously concluded that the Plaintiff had stated a claim for excessive force, for purposes of surviving a Motion to Dismiss, based upon Van Schaick's deployment of the taser gun, and based upon the actions of G. Hanson, Kezar, and Lindgren, to physically restrain the Plaintiff on the mattress.   See, <u>Order</u>, <u>Docket No. 69</u>, at 30-31.  The District Court further concluded that the Plaintiff had adequately alleged an official-capacity claim, based upon the use of the taser gun. <u>Id.</u> at 31.  We address the Plaintiff's claims in turn.

## III.  <u>Discussion</u>

A.    <u>Standard of Review</u>.  Summary Judgment is not an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no

issues which require the unique proficiencies of a Jury in weighing the evidence, and in rendering credibility determinations.  See, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986); <u>Midwest Oilseeds, Inc. v. Limagrain Genetics Corp.</u>, 387 F.3d 705, 711 (8th Cir. 2004), cert. denied, 544 U.S. 977 (2005).  Summary Judgment is appropriate when we have viewed the facts, and the inferences drawn from those facts, in a light most favorable to the nonmoving party, and we have found no triable issue.  See, <u>Eide v. Grey Fox Technical Servs. Corp.</u>, 329 F.3d 600, 604 (8th Cir. 2003); <u>Philip v. Ford Motor Co.</u>, 328 F.3d 1020, 1023 (8th Cir. 2003); <u>United Fire & Casualty Co. v. Garvey</u>, 328 F.3d 411, 413 (8th Cir. 2003).  For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a Verdict for the nonmoving party.  See, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Planned Parenthood of Minnesota/South Dakota v. Rounds</u>, 372 F.3d 969, 972 (8th Cir. 1004); <u>Fenney v. Dakota, Minnesota & Eastern R.R. Co.</u>, 327 F.3d 707, 711 (8th Cir. 2003)

As Rule 56(e) makes clear, once the moving party files a properly supported Motion, the burden shifts to the nonmoving party to demonstrate the existence of a genuine dispute.  In sustaining that burden, "an adverse party may not rest upon the

mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavit or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial." Rule 56(e), Federal Rules of Civil Procedure; see also, Anderson v. Liberty Lobby, Inc., supra at 256; Eddings v. City of Hot Springs, Ark., 323 F.3d 596, 602 (8th Cir. 2003).

Moreover, the movant is entitled to Summary Judgment where the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, supra at 322; see also, Forest Park II v. Hadley, 408 F.3d 1052, 1057 (8th Cir. 2005); Mercer v. City of Cedar Rapids, 308 F.3d 840, 843 (8th Cir. 2002); Hammond v. Northland Counseling Center, Inc., 218 F.3d 886, 891 (8th Cir. 2000).  No genuine issue of fact exists in such a case because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, supra at 323; see also, Sallis v. Univ. of Minnesota, 408 F.3d 470, 474 (8th Cir. 2005); Davis v. U.S. Bancorp, 383 F.3d 761, 768 (8th Cir. 2004); Bell Lumber and Pole Co. v. United States Fire Ins. Co., 60 F.3d 437, 441 (8th Cir. 1995).

B.   <u>Legal Analysis</u>.   The Defendants contend that they are entitled to qualified immunity, as to each of the Plaintiff's claims, based upon their contention that the Plaintiff cannot demonstrate any violation of his constitutional rights. Government officials, who are performing discretionary functions, are generally shielded from liability for civil damages, unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known.  See, <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999); <u>Young v. Harrison</u>, 284 F.3d 863, 866 (8th Cir. 2002); <u>Winters v. Adams</u>, 254 F.3d 758, 766 (8th Cir. 2001).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in the light of the legal rules that were 'clearly established' at the time it was taken." <u>Wilson v. Layne</u>, supra at 614.  The contours of the constitutional right at issue "must be sufficiently clear that a reasonable official would understand that what he is doing violates that right," but "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in light of pre-existing law, the unlawfulness must be apparent." <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987).  Thus, "[t]he doctrine 'gives ample room for mistaken judgments but does not

protect the plainly incompetent or those who knowingly violate the law.'" <u>Bagby v. Brondhaver</u>, 98 F.3d 1096, 1098 (8th Cir. 1996).

When qualified immunity is asserted in a Section 1983 action, we "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all * * *." <u>Jones v. Shields</u>, 207 F.3d 491, 494 (8th Cir. 2000), quoting <u>Wilson v. Layne</u>, supra [citations omitted].  "Only then do we ask whether that right was clearly established at the time of the alleged violation." <u>Id.</u>; see, <u>Coonts v. Potts</u>, 316 F.3d 745, 750 (8th Cir. 2003), citing <u>Siegert v. Gilley</u>, 500 U.S. 226, 232 (1991).  With these precepts in mind, we proceed to a consideration of the Plaintiff's claims.

    1.   <u>Count Six</u>.  With respect to Count Six, the Kittson County Defendants argue that the Plaintiff has failed to demonstrate any constitutional violation, with respect to the handling of his legal mail by Dalzell, Porter, or Hultgren, and they further argue that the Jail's policy on legal mail is constitutional.  See, <u>County Defendants' Memorandum in Support</u>, <u>Docket No. 94</u>, at 24, 29.  We agree.

Under the First Amendment, "a prisoner's constitutional right to send and receive mail may be restricted only for legitimate penological interests." <u>Phelps v. United States Federal Government</u>, 15 F.3d 735, 740 (8th Cir. 1994), cert. denied, 511 U.S. 1114 (1994), citing <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 407 (1989), and

Bumgarner v. Bloodworth, 768 F.2d 297, 301 (8th Cir. 1985).  Moreover, "[p]risoners retain their First Amendment rights of sending and receiving mail, and prison officials may not read inmates' legal mail."  Foster v. Helling, 210 F.3d 378, 2000 WL 328116 at *1 (8th Cir. 2000), citing Thongvanh v. Thalacker, 17 F.3d 256, 258-59 (8th Cir. 1994).

Indeed, our Court of Appeals has explicitly held that a prisoner's legal mail may not be opened outside of the presence of the prisoner.  See, Powells v. Minnehaha County Sheriff Dep't, 198 F.3d 711, 712 (8th Cir. 1999)("[L]egal mail, mail to and from inmate's attorney and identified as such, may not be opened except in prisoner's presence[.]"), citing Jensen v. Klecker, 648 F.2d 1179, 1182 (8th Cir. 1981), citing in turn Wolff v. McDonnell, 418 U.S. 539, 576-77 (1974); see also, Thomsen v. Ross, 368 F. Supp.2d 961, 973-974 (D. Minn. 2005)("A jailer who opens a prisoner's legal mail outside of the prisoner's presence may violate a prisoner's constitutional rights.").

Here, with respect to the Plaintiff's individual capacity claims, the Defendants' undisputed Affidavits establish that Dalzell did not read the Plaintiff's mail, and that the Plaintiff was not directed, or required to submit his legal mail, while unsealed, notwithstanding his unsupported allegations to the contrary.  See, Dalzell Aff., supra

at ¶¶2-4; <u>Porter Aff.</u>, supra at ¶¶3-5; <u>Hultgren Aff.</u>, supra at ¶¶2-3. Porter and Hultgren further attest that the Plaintiff did not raise any complaints concerning the treatment of his legal mail. See, <u>Porter Aff.</u>, supra at ¶5; <u>Hultgren Aff.</u>, supra at ¶2. Although the Plaintiff baldly asserts that the Kittson County Defendants have committed perjury, by means of their Affidavits, he makes those allegations in an unsworn response.

Given the Plaintiff's failure to demonstrate a violation of his constitutional rights, we conclude that the Kittson County Defendants are entitled to qualified immunity, as well as an award of Summary Judgment, with respect to the Plaintiff's individual capacity claims. See, <u>Poole v. Wansing</u>, 2008 WL 4151620 at *3 (W.D. Mo., September 3, 2008)("[B]ased on the undisputed facts showing plaintiff's legal mail was not opened outside his presence, * * * defendant O'Brien is entitled to judgment as a matter of law."); <u>Stockdale v. Dwyer</u>, 2007 WL 2994316 at *8 (E.D. Mo., October 11, 2007)(concluding that the plaintiff's unsupported and conclusory allegation, that prison officials had opened and read the contents of incoming and outgoing legal mail, outside of the plaintiff's presence, was "insufficient to raise a genuine issue of material fact precluding summary judgment"); see also, <u>Bell-Bey v. Williams</u>, 87 F.3d 832, 837 (6th Cir. 1996)(holding that qualified immunity barred the

plaintiff's claims, where "Bell-Bey's mail was neither opened outside of his presence nor read.").

We further find that the Plaintiff's official capacity claims, which relate to the Jail's policy on legal correspondence, fail as a matter of law.  In an action under Title 42 U.S.C. §1983, a public servant may be sued in an official, or in an individual capacity, or both.  See, <u>Johnson v. Outboard Marine Corp.</u>, 172 F.3d 531, 535 (8th Cir. 1999).  As noted by the Kittson County Defendants, a suit against a public employee in that person's official capacity is merely a suit against the public employer -- in this case, Kittson County.  <u>Id.</u>, citing <u>Kentucky v. Graham</u>, 473 U.S. 159, 165 (1985).  In turn, a County can be liable under Section 1983 if a plaintiff can prove that it has adopted some policy, custom, or practice, that caused a violation of the Plaintiff's Federal constitutional rights.  See, <u>Lund v. Hennepin County</u>, 427 F.3d 1123, 1125 (8th Cir. 2005); <u>City of Canton v. Harris</u>, 489 U.S. 378, 386-87 (1989); see also, <u>Angarita v. St. Louis County</u>, 981 F.2d 1537, 1546 (8th Cir. 1992)("A municipality may be held liable under Section 1983 only if a municipal custom or policy caused the deprivation of [a] right protected by the constitution or federal laws."); <u>Williams v. Little Rock Municipal Water Works</u>, 21 F.3d 218, 223 (8th Cir. 1994)("[M]unicipal governments can be held liable for the acts of their employees in contravention of the civil rights

of individuals only upon a showing that a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' is the motivating force behind the acts of those employees"), quoting Monell v. Dep't of Social Services, 436 U.S. 658, 690 (1978).

Here, the Plaintiff contends that the Jail's policy on inmate correspondence is unconstitutional, based upon his unfounded allegation that he was required to submit his outgoing legal mail while it was unsealed.  However, the Defendants' undisputed Affidavits establish that the Jail's policy, with respect to legal mail, amply satisfies the constitutional requirements, as identified by the Supreme Court in Wolff v. McDonnell, supra at 577.  In Wolff, the Court held that prison officials, "by acceding to a rule whereby the inmate is present when mail from attorneys is inspected, have done all, and perhaps even more, than the Constitution requires." Id.; see also, Travis v. Norris, 805 F.2d 806, 809 n. 1 (8th Cir. 1986)("An inmate's privileged legal mail may be opened in the inmate's presence to inspect for contraband."); Bell-Bey v. Williams, supra at 839 ("Had [the prison's] policy called for the mail to be inspected outside of the prisoner's presence, its validity might be called into serious question.").

Here, the Kittson County Defendants have submitted a copy of the Jail's policy on inmate correspondence, see, Hill Aff., supra, Exhibit A at p. 59, which establishes

that legal mail is not opened, nor inspected by Jail staff, except in the presence of the inmate.  In addition, Dalzell and Hultgren attest that the Jail's staff members do not read or censor incoming or outgoing legal mail, and they further attest that inmates are not instructed to leave outgoing legal mail unsealed, notwithstanding the Plaintiff's bald allegations to the contrary.  See, Dalzell Aff., supra at ¶4; Hultgren Aff., supra at ¶3.  Dalzell and Hultgren also attest that, according to Jail policy, incoming legal mail is opened only in the presence of the inmate, if at all, and outgoing legal mail "is typically received sealed from the inmate, and is sent out for delivery without being opened."  Id.; Hultgren Aff., supra at ¶3.  However, if outgoing legal mail is submitted while unsealed, then, according to Dalzell and Hultgren, that mail is sealed by Jail staff prior to mailing.  Id.; Hultgren Aff., supra at ¶3.

Based upon the undisputed evidence submitted by the Defendants, we find that the Jail's policy on legal mail complies with the requirements of the Constitution. See, Gardner v. Howard, 109 F.3d 427, 430 (8th Cir. 1997)(finding proof that the general policy on legal mail met constitutional standards, where "[p]roperly marked legal mail is opened only in the presence of the inmate."), citing Harrod v. Halford, 773 F.2d 234, 235 (8th Cir. 1985), cert. denied, 476 U.S. 1143 (1986).   As a

consequence, we recommend that Summary Judgment be granted in favor of the Kittson County Defendants, with respect to the Plaintiff's official capacity claims.

In sum, we find that the Kittson County Defendants are entitled to Summary Judgment with respect to Count Six, given the absence of any genuine issue of material fact, and given the absence of any evidence to support the Plaintiff's allegations of interference with his legal mail.

2.    <u>Count Seven</u>.  In Count Seven, the Plaintiff asserts a Fourteenth Amendment claim, in which he alleges that the Kittson County Defendants deprived him of treatment for Hepatitis C, which had been prescribed prior to his arrest and detention.   Since the Plaintiff was a pretrial detainee at the time of the alleged violations, we construe his claim, which relates to a denial of medical treatment, under the Fourteenth Amendment's Due Process Clause, rather than under the Eighth Amendment.  See, <u>Bell v. Wolfish</u>, 441 U.S. 520, 535 n. 16 (1979); accord, <u>Butler v. Fletcher</u>, 465 F.3d 340 (8th Cir. 2006), cert. denied, --- U.S. ----, 127 S. Ct. 2128 (2007); <u>Owens v. Scott County Jail</u>, 328 F.3d 1026, 1027 (8th Cir. 2003).

"Under the Fourteenth Amendment, pretrial detainees are entitled to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment." <u>Owens v. Scott County Jail</u>, supra at 1027, quoting <u>City of Revere v.</u>

Mass. Gen. Hosp., 463 U.S. 239, 244 (1983).   "[D]eliberate indifference is the appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care, and reasonable safety."   Butler v. Fletcher, supra at 345.

To prevail on a claim of constitutionally inadequate medical care, an inmate must "demonstrate (1) that [he] suffered objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir. 1997), citing Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997); Crow v. Montgomery, 403 F.3d 598, 602 (8th Cir. 2005); Pagels v. Morrison, 335 F.3d 736, 740 (8th Cir. 2003); Tlamka v. Serrell, 244 F.3d 628, 633 (8th Cir. 2001).   "As long as this threshold is not crossed, inmates have no constitutional right to receive a particular or requested course of treatment." Dulany v. Carnahan, supra, citing Long v. Nix, 86 F.3d 761, 765 (8th Cir. 1996).

"An objectively serious medical need is one that either has been diagnosed by a physician as requiring treatment, or is so obvious that even a 'layperson would easily recognize the necessity for a doctor's attention.'" Jones v. Minnesota Dep't of Corrections, 512 F.3d 478, 481 (8th Cir. 2008), citing Coleman v. Rahija, supra at 784, quoting in turn, Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995).   In turn,

"[d]eliberate indifference may be manifested by * * * prison officials in intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment." Meloy v. Bachmeier, 302 F.3d 845, 848 (8ᵗʰ Cir. 2002).  However, "[t]he prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." Jolly v. Knudsen, 205 F.3d 1094, 1096 (8ᵗʰ Cir. 2000), quoting Estate of Rosenburg v. Crandell, 56 F.3d 35, 37 (8ᵗʰ Cir. 1995); see also, Smith v. Clarke, 458 F.3d 720, 724 (8ᵗʰ Cir. 2006); Roberson v. Bradshaw, 198 F.3d 645, 647 (8ᵗʰ Cir. 1999)("'Mere negligence or medical malpractice, however, are insufficient to rise to a constitutional violation.'"), quoting Dulany v. Carnahan, supra at 1239.

Our initial inquiry focuses on whether the Plaintiff suffered from an objectively serious medical need.  See, Jolly v. Knudsen, supra at 1096.  A serious medical need is 'one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" Vaughn v. Greene County, 438 F.3d 845, 851 (8ᵗʰ Cir. 2005), quoting Pool v. Sebastian County, 418 F.3d 934, 944 (8ᵗʰ Cir. 2005), quoting, in turn, Johnson v. Busby, 953 F.2d 349, 351 (8ᵗʰ Cir. 1991); Grayson v. Ross, 454 F.3d 802, 808-09 (8ᵗʰ Cir. 2006).  While Hepatitis C is undoubtedly a serious medical problem, the issue before us is not whether the infection itself is a "serious medical

need," but whether the Plaintiff had a serious medical need for Hepatitis C medications, while he was housed at the Jail.  See, <u>Bender v. Regier</u>, 385 F.3d 1133, 1137 (8th Cir. 2004).

Here, the Plaintiff has not produced any medical evidence, which would support his claim of an objectively serious medical need.  It is well-settled that "[t]he objective portion of the deliberate indifference standard requires a showing of 'verifying medical evidence' that the defendants ignored an acute or escalating situation or that delays adversely affected [the plaintiff's] prognosis, given the type of injury in [the] case." <u>Dulany v. Carnahan</u>, supra at 1243, quoting <u>Crowley v. Hedgepeth</u>, 109 F.3d 500, 502 (8th Cir. 1997); see also, <u>Senty-Haugen v. Goodno</u>, 462 F.3d 876, 890 (8th Cir. 2006), cert. denied, --- U.S. ----, 127 S. Ct. 2048 (2007); <u>Coleman v. Rahija</u>, supra at 785; <u>Beyerbach v. Sears</u>, 49 F.3d 1324, 1326 (8th Cir. 1995), abrogated on other grounds, <u>Johnson v. Jones</u>, 515 U.S. 304 (1995).  On this Record, we find no "verifiable medical evidence" that the Defendants ignored "an acute or escalating condition," or that a delay in treatment adversely affected the Plaintiff's prognosis -- indeed, the evidence is to the contrary.

The medical records, that have been submitted by the Kittson County Defendants, show that the Plaintiff was seen by physicians at least twice during his

detention at the Jail, and on neither occasion did he ask about receiving treatment for Hepatitis C.  In fact, the records from Nupdal's examination of the Plaintiff, in March of 2005, reflect that, while the Plaintiff had been diagnosed with Hepatitis C, his liver enzymes were stable, and the remainder of his blood work was negative for abnormalities.  Moreover, even though the Plaintiff was initially prescribed Hepatitis C medication in August of 2004, his primary care physician, Dr. Chu, apparently acquiesced to an initial delay of treatment until January of 2005.  Our review of the Record discloses no intimation that the Plaintiff's Hepatitis C worsened, or that the Plaintiff's general health deteriorated, as a result of his time at the Jail.  See, Pool v. Sebastian County, supra at 944 ("A serious medical need is 'one that is so obvious that even a layperson would easily recognize the need for a doctor's attention.'"), quoting Johnson v. Busby, supra at 351.  Accordingly, the Plaintiff has failed to demonstrate that he suffered from any objectively serious need for Hepatitis C treatment.

Nonetheless, even assuming that the Plaintiff had satisfied the objective criterion of the Farmer dialectic, by establishing the existence of a deprivation that was "objectively, sufficiently serious," Farmer v. Brennan, 511 U.S. 825, 834 (1994), we conclude that he has failed to prove that the Kittson County Defendants were deliberately indifferent to his need for medical treatment.  As we have related, the

Plaintiff contends that the Kittson County Defendants refused to allow him to take his prescribed Hepatitis C medication, while at the Jail.  See, <u>Complaint</u>, supra at ¶¶171(B), 172-175.  "[I]ntentionally interfering with * * * treatment once prescribed" is a violation of the Eight Amendment, <u>Estelle v. Gamble</u>, 429 U.S. 97, 104-05 (1976), and "[p]rison officials cannot substitute their judgment for a medical professional's opinion." <u>Meloy v. Bachmeier</u>, supra at 849, citing <u>Zentmyer v. Kendall County</u>, 220 F.3d 805, 812 (7th Cir. 2000); see also, <u>Humphrey v. Haynes</u>, 2008 WL 4949855 at *6 (W.D. Ark., November 17, 2008)("The knowing failure to administer prescribed medicine can itself constitute deliberate indifference."), citing <u>Johnson v. Hay</u>, 931 F.2d 456, 461 (8th Cir. 1991).

However, the Kittson County Defendants have produced undisputed evidence to show that, on December 20, 2004, they were instructed not to provide the Plaintiff with his Hepatitis C medications until he was seen by Dr. Chu.  The Plaintiff did not attend his scheduled doctor's appointment on January 12, 2005, due to his removal from the Jail, and the Kittson County Defendants attest that, following the Plaintiff's return to the Jail, they received no further instructions concerning his Hepatitis C treatment -- i.e., they were never instructed to provide the Plaintiff's Hepatitis C medications.  Cf., <u>Richey v. Ferguson</u>, 2007 WL 710129 at *20 (W.D. Ark., March

6, 2007)(Summary Judgment denied where the plaintiff was taking daily medication for HIV prior to incarceration, and the evidence demonstrated that the defendants knew of his diagnosis but "offered no explanation for [a one (1) month] delay in obtaining Richey's prescription medications."). The Plaintiff does not dispute that evidence.

Accordingly, the Record establishes that the Plaintiff never had a physician's appointment that resulted in an authorization to begin taking his Hepatitis C medications and, as a result, there is simply no evidence that the Kittson County Defendants interfered with the Plaintiff's prescribed course of treatment. Cf., Johnson v. Hay, supra at 461 (prisoner stated a claim for violation of Eighth Amendment when prison pharmacist deliberately refused to fill legitimate prescriptions for anti-seizure medications, based upon the pharmacist's belief that the prisoner did not suffer from a seizure disorder); Easter v. Powell, 467 F.3d 459, 463-64 (5th Cir. 2006)(deliberate indifference manifested by nurse who sent prisoner with heart problems to pharmacy, and refused to provide him with cardiac medications when he found the pharmacy closed); Meloy v. Schuetzle, 230 F.3d 1363, 2000 WL 1160446 at *1 (8th Cir. 2000) [Table Disposition] (prisoner stated claim for violation of Eighth Amendment when prison officials denied him access to a physician-prescribed breathing apparatus);

Jolly v. Badgett, 144 F.3d 573, 573 (8th Cir. 1998) (Summary Judgment granted when prisoner failed to show prison officials were aware that delay in administering medications could result in physical harm); Humphrey v. Haynes, supra at *6 (denying Summary Judgment where "the record shows, Plaintiff filed grievances regarding his lack of medication."); Thornton v. Sanders, 2008 WL 2561965 at *4 (W.D. Ark., June 24, 2008)(denying Summary Judgment where the plaintiff submitted evidence that the defendant knew he needed blood pressure medication, but did not respond to his request for medication).[11]

Moreover, the Plaintiff has not produced any competent evidence, which would show that the Kittson County Defendants were deliberately indifferent to a request for medical treatment. The Record confirms that, following the Plaintiff's return to the Jail, he voiced no additional complaints concerning his Hepatitis C, although, on

---

[11]To the extent that the Plaintiff argues that he should have been able to take his prescribed medication, notwithstanding his physician's directive, our Court of Appeals has observed that a "mere disagreement with treatment decisions does not rise to the level of a constitutional violation[.]" Phillips v. Jasper County Jail, 437 F.3d 791, 795 (8th Cir. 2006), citing Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995); see also, Rowe v. Norris, 198 Fed.Appx. 579, 581 (8th Cir. 2006)(No Eighth Amendment violation because inmate disagreed with physician's choice of medication); Prater v. Dep't of Corr., 11 Fed.Appx. 668, 668 (8th Cir. 2001)(No Eighth Amendment violation where inmate demanded boots, rather than insoles, for injured foot). Simply put, the Plaintiff's disagreement with his physician's directive is insufficient to create a material issue of fact. See, Jones v. Norris, 310 F.3d 610, 612 (8th Cir. 2002); Sherrer v. Stephens, 50 F.3d 496, 497 (8th Cir. 1994).

several occasions, the Plaintiff sought medical treatment for, or complained of, other, unrelated health concerns.  Cf., <u>Givens v. Jones</u>, 900 F.2d 1229, 1233 (8th Cir. 1990)(Summary Judgment granted to prison officials, who allegedly denied the prisoner access to medical care for leg pain, since there was no showing that the prisoner's condition was acute).

We note that the Plaintiff now argues, in his responsive memorandum, that he should have been transported to the Altru Clinic, presumably for Hepatitis C treatment, following his appearance in Kittson County District Court on February 22, 2005.  See, <u>Plaintiff's Memorandum in Opposition</u>, supra at 39; <u>Hultgren Aff.</u>, supra, Exhibit F.  However, there is no competent evidence in the Record to demonstrate that the Plaintiff had scheduled, or requested, such an appointment, or that he suffered harm as a result of the Kittson County Defendants' failure to promptly schedule such an appointment.[12]  See, <u>Coleman v. Rahija</u>, supra at 784 ("An inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs."), citing <u>Crowley v. Hedgepeth</u>, supra at 502.

---

[12]As we have noted, the Plaintiff apparently admits that no appointment had been scheduled at the Altru Clinic, based upon his purported citation to the transcript of his Hearing before the Kittson County District Court.  See, <u>Plaintiff's Memorandum in Opposition</u>, supra at 39.

In fact, the Kittson County Defendants attest that the Plaintiff did not complain about his Hepatitis C treatment, nor did he request any Hepatitis C treatment, at any point following his return to the Jail on February 16, 2005.  Dalzell and Hultgren further attest that, if the Plaintiff had requested Hepatitis C treatment, they would have arranged for an appointment with his physician.  Cf., <u>Sanchez v. Taggart</u>, 144 F.3d 1154, 1156 (8th Cir. 1998)(Defendant had an obligation "to confirm inferences of risk that he strongly suspected to exist," where the plaintiff told the defendant "that he had a medical condition restricting his ability to work and that confirmation of his physical limitations was in his file, [but the defendant] failed to inquire further."). Accordingly, there is no evidence, in the Record, that the Kittson County Defendants ever received, and denied, an express request from the Plaintiff for Hepatitis C treatment -- whether at the Altru Clinic or otherwise -- following the Plaintiff's return to the Jail, and the Plaintiff admits that he made no such request.  See, <u>Moore v. Jackson</u>, 123 F.3d 1082, 1086 (8th Cir. 1997)("A careful review of the record reveals that there is no evidence [the defendants] knew about Moore's serious medical condition * * * ."); <u>Brown v. Hickman</u>, 2007 WL 2806711 at *16 (W.D. Ark., September 25, 2007)(granting Summary Judgment where "there is no indication he sought medical treatment for the alleged injuries or that defendants ignored an acute

or escalating condition with respect to Brown's health."); <u>Fessler v. Metropolitan Airports Commission</u>, 2006 WL 1085164 at *4 (D. Minn., April 25, 2006)("There is no evidence on the record to alert the officers that Plaintiff had incurred any injury."). As a result, the Plaintiff has not demonstrated that any genuine issue of material fact remains, concerning his claim for Hepatitis C treatment.

Since the Plaintiff has not satisfied the objective prong of the <u>Farmer</u> inquiry, and since we have no evidence that the Kittson County Defendants knowingly withheld or delayed any prescribed or requested medical treatment, we recommend that Summary Judgment be granted, in favor of the Kittson County Defendants, with respect to Count Seven.

3.    <u>Count Nine</u>.  In Count Nine, the Plaintiff alleges that the Kittson County Defendants failed to transport him to a dental appointment, which had been scheduled prior to his arrest and detention, in order to obtain dentures.  See, <u>Complaint</u>, supra at ¶171(D).  As a result of that alleged delay in treatment, the Plaintiff contends that he suffered injuries to his mouth, including a deteriorated bone structure, and burns, abrasions and lacerations, to his gums and esophagus, due to his inability to chew his food.  <u>Id.</u>

Once again, the Plaintiff has not submitted any competent evidence -- medical or otherwise -- to prove those claimed injuries.  See, Lafever v. Newborn, 2007 WL 2461687 at *3 (W.D. Ark., August 27, 2007)("[T]here is no medical evidence submitted to support that Plaintiff's toothache was a serious medical need.").  There is no competent evidence, in the Record, apart from the Plaintiff's bare allegations, that he had a dental appointment for dentures, or that he "suffered injury to his mouth," that his "bone structure has significantly deteriorated," that he suffered "burns, abrasions and lacerations," or that he "spit blood after eating," owing to a lack of dentures.  See, Complaint, supra at ¶171.

Nonetheless, even assuming that the Plaintiff's need for dentures qualifies as an objectively serious medical need, see, Hartsfield v. Colburn, 491 F.3d 394, 397 (8th Cir. 2007), cert. denied, --- U.S. ----, 128 S. Ct. 1745 (2008)("[D]ental care is an important part of proper health care."), the undisputed evidence demonstrates that the Kittson County Defendants were not deliberately indifferent to that need.  As we have detailed, the Plaintiff alleges that Dalzell, Hultgren, and Porter, were aware of his dental appointment, because he provided an appointment slip to Hultgren.

However, Dalzell and Hultgren attest that the Plaintiff never requested a dental appointment, and they further attest that he never complained of any injuries to his

gums, or of pain while eating.  See, <u>Dalzell Aff.</u>, supra at ¶10; <u>Hultgren Aff.</u>, supra at ¶11.  Dalzell and Hultgren also attest that, during his detention at the Jail, the Plaintiff made only one (1) complaint concerning any dental problems, by asking that his waffles be softened in the microwave, owing to his lack of teeth.  <u>Id.</u>; <u>Hultgren Aff.</u>, supra at ¶11; <u>Rowlette Aff.</u>, supra, Exhibit P.  Lastly, Dalzell and Hultgren aver that the Plaintiff was never seen spitting blood after eating.  <u>Id.</u>; <u>Hultgren Aff.</u>, supra at ¶11.  For his part, Porter attests that he never denied any medical treatment to the Plaintiff, and that he never received any complaints concerning the Plaintiff's medical treatment.  See, <u>Porter Aff.</u>, supra at ¶6.

As a result, the uncontroverted evidence demonstrates that the Kittson County Defendants were not aware of, nor deliberately indifferent to, the Plaintiff's alleged dental problems.  See, <u>Moore v. Jackson</u>, supra at 1086; <u>Brown v. Hickman</u>, supra at *16; <u>Fessler v. Metropolitan Airports Commission</u>, supra at *4.  The Kittson County Defendants attest, and the Plaintiff does not dispute, that they were not aware of any dental injuries or problems, other than the Plaintiff's request for softened waffles, owing to his lack of teeth.  Absent some "obvious signs" of an objectively serious medical condition, the Plaintiff cannot demonstrate that the Kittson County Defendants knew of, but were deliberately indifferent to, his need for dental treatment.

See, <u>Hartsfield v. Colburn</u>, supra at 397; cf., <u>Moore v. Jackson</u>, supra at 1086 (reversing Summary Judgment, where circumstantial evidence suggested that the prison dentist knew of the plaintiff's pain, based upon grievances and eventual authorization of tooth extraction); <u>Boyd v. Knox</u>, 47 F.3d 966, 969 (8th Cir. 1995)("A three-week delay in dental care, coupled with knowledge of the inmate-patient's suffering, can support a finding of an Eighth Amendment violation under section 1983," but Summary Judgment granted where, "[i]n their affidavits, [the defendants] effectively disclaim any knowledge of Boyd's treatment"); <u>Patterson v. Pearson</u>, 19 F.3d 439, 440 (8th Cir. 1994)(Summary Judgment reversed where prison dentist delayed treatment, despite knowledge that the plaintiff was in severe pain, had swollen jaw, and pus coming from his eye, due to an infected tooth); <u>Fields v. Gander</u>, 734 F.2d 1313, 1314 (8th Cir. 1984)(Summary Judgment reversed where the plaintiff submitted a "sworn statement that [the defendant] knew of his [dental] pain for several weeks but denied him dental care in an attempt to compel payment of his earlier dental bill").

Accordingly, we recommend that the Kittson County Defendants be granted Summary Judgment as to Count Nine.

4.    <u>Count Ten</u>.   As we have detailed, the Plaintiff claims that Van Schaick used excessive force by tasering him, and that the other officers failed to intervene.   See, <u>Complaint</u>, supra at ¶¶188-191, 193, 197.   In addition, the Plaintiff maintains that Pennington County's policy on the use of force, including tasers, is unconstitutional.   Lastly, the Plaintiff claims that G. Hanson, Kezar, and Lindgren, employed excessive force to physically restrain him, while NWMC staff administered medication.   <u>Id.</u> at ¶¶73-89.   We address those claims separately below.

a.    <u>Tasering the Plaintiff</u>.   As noted, the Plaintiff alleges that, after he was admitted to the NWMC, Van Schaick ordered him to roll over so that he could receive injections of medication from the hospital staff, and that, when he refused, Van Schaick shot him with a taser gun.   See, <u>Complaint</u>, supra at ¶197, 338.

As a pretrial detainee, the Plaintiff's unreasonable force claim is analyzed under the Due Process Clause of the Fourteenth Amendment.[13]   See, <u>Graham v. Connor</u>, 490 U.S. 386, 395 n.10 (1989).   While the law is clear that a pretrial detainee cannot be

---

[13]Since our Court of Appeals has found that excessive force claims, which are brought by individuals who were involuntarily committed, are subject to the same analysis as pretrial detainees, we do not need to determine whether the Plaintiff's status changed on his admission to the NWMC.   See, <u>Andrews v. Neer</u>, 253 F.3d 1052, 1061 (8th Cir. 2001); see also, <u>Youngberg v. Romeo</u>, 457 U.S. 307, 316-17 (1982)(analyzing rights of an involuntarily committed individual under the Due Process Clause, rather than the Eighth Amendment).

punished, see, <u>Bell v. Wolfish</u>, supra at 535, "not every disability that is imposed during pretrial detention amounts to 'punishment' in the Constitutional sense." <u>Smith v. Copeland</u>, 87 F.3d 265, 268 (8th Cir. 1996).   "The evaluation of excessive-force claims brought by pre-trial detainees, although grounded in the Fifth and Fourteenth Amendments rather than the Fourth Amendment, also relies on an objective reasonableness standard," <u>Andrews v. Neer</u>, 253 F.3d 1052, 1060 (8th Cir. 2001), and the relevant inquiry is whether the law enforcement officers acted in a reasonable manner, in light of the facts and circumstances that confronted them.  See, <u>Moore v. Novak</u>, 146 F.3d 531, 535 (8th Cir. 1998)("[T]he question for the [fact finder] is whether, judging from the perspective of a reasonable officer at the scene * * * , the totality of the circumstances justifies the amount of force used."); <u>Johnson-El v. Schloemehl</u>, 878 F.2d 1043, 1048 (8th Cir. 1989).

"In deciding whether a particular use of force was reasonable, we consider whether there was an objective need for force, the relationship between the need and the amount of force used, the threat reasonably perceived by correctional officers, the efforts by the officers to temper the severity of the forceful response, and the extent of the inmate's injuries."  <u>Nelson v. County of Wright</u>, 162 F.3d 986, 990 (8th Cir. 1998).  However, "[t]he alleged use of excessive force is generally an issue of fact."

Duncan v. Storie, 869 F.2d 1100, 1103 (8th Cir. 1989), cert. denied, 493 U.S. 852 (1989), citing Patzner v. Burkett, 779 F.2d 1363, 1371 (8th Cir. 1985).

In Duncan v. Storie, supra, the Court denied a Motion for Summary Judgment on an excessive force claim, when the plaintiff alleged that he was savagely beaten and shot with a stun gun during an arrest, finding that the record created a genuine issue of material fact as to the reasonableness of the force used.  Compare, Jasper v. Thalacker, 999 F.2d 353 (8th Cir. 1993)(use of a stun gun to subdue an inmate who was threatening a prison guard did not constitute excessive force pursuant to the Eighth Amendment, even when lesser force might have controlled the inmate, absent a showing that the stun gun was used maliciously); with Moore v. Novak, supra at 532 (use of stun gun reasonable under the Fourth Amendment, where inmate was intoxicated, verbally abusive, had kicked an officer, refused to comply with direct orders, and struggled to break free).

Here, the undisputed evidence demonstrates that the Plaintiff was being held in a secure room at the NWMC, and that he refused to take medications. Consequently, the hospital staff called for additional law enforcement, including Van Schaick, who responded to the hospital's request for an officer with a taser gun.  The Plaintiff stated that he had Hepatitis C, and that he would bite or spit at anyone who

tried to approach him for the purpose of administering medications.  Van Schaick twice ordered the Plaintiff to roll over onto his stomach, and warned that he would discharge the taser gun if the Plaintiff did not comply.  When the Plaintiff refused, Van Schaick deployed the taser gun, after which the Plaintiff calmed down, and cooperated with the officers, and with hospital staff.

We have previously considered these undisputed facts, and concluded that a Jury could disagree as to the reasonableness of Van Schaick's actions.  See, Report and Recommendation, Docket No. 60, at 57.  Therefore, we recommended that Summary Judgment be denied, id., and that recommendation was adopted by the District Court.  See, Order, Docket No. 69, at 31.

Van Schaick has now submitted an Affidavit, in which he attests that he has received, and taught, use of force training on several occasions.  See, Van Schaick Aff., supra at ¶9.  He further attests that, based upon that training, he concluded that the use of a taser gun was appropriate, and consistent with Pennington County's use of force policy, because the Plaintiff "was threatening great bodily harm to those in the secure room, and in light of his [Hepatitis C] condition, hands-on methods of force were not appropriate."  Id.  Porter has also submitted an Affidavit, in which he attests that the use of hands-on physical force would not have been appropriate, in light of

the Plaintiff's contagious condition, and his threats to the officers.  See, <u>Porter Aff.</u>, supra at ¶¶16, 19.

In assessing excessive force claims, we are immersed in questions of degree, which are rife with opportunities to second-guess from a removed and academic perspective.  As the Court explained, in <u>Andrews v. Fuoss</u>, 417 F.3d 813, 818 (8th Cir. 2005), quoting <u>Crumley v. City of St. Paul</u>, 324 F.3d 1003, 1007 (8th Cir. 2003), quoting, in turn, <u>Graham v. Connor</u>, supra at 396-97, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation."   Under the circumstances presented here, we need not determine whether the Defendants' additional evidence establishes the objective reasonableness of Van Schaick's conduct, because we conclude that the Plaintiff's claim fails on other grounds.

In our previous Report and Recommendation, we did not focus our analysis on the Plaintiff's alleged injuries.  However, upon further review, we conclude that the Plaintiff's excessive force claim fails as a matter of law, because he has failed to demonstrate any actual injury -- not even a de minimis injury -- which resulted from use of the taser gun.  See, <u>Andrews v. Fuoss</u>, supra at 818 (excessive force claim

cannot be sustained where claimant shows no more than "very minor injuries, likely nothing more than the temporary and slight aggravation of pre-existing conditions"); Hanig v. Lee, 415 F.3d 822, 824 (8th Cir. 2005)("An 'actual injury' must be shown to support an excessive force claim under the Fourth Amendment."), citing Dawkins v. Graham, 50 F.3d 532, 535 (8th Cir. 1995); Brown v. City of Golden Valley, 534 F. Supp.2d 984, 993-994 (D. Minn. 2008)("Mere allegations of pain as a result of being handcuffed, including bleeding, without any allegation of long-term injuries, are not sufficient injuries to support a claim for excessive force."), citing Crumley v. City of St. Paul, supra at 1008; compare, Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006) (finding that "relatively minor scrapes and bruises and the less-than-permanent aggravation of a prior shoulder condition were de minimis injuries that support a conclusion that [the defendant] did not use excessive force" during the course of the plaintiff's arrest).

Our close review of the Record has failed to disclose any competent evidence that the taser gun caused **any** injury to the Plaintiff -- indeed, the Plaintiff does not even allege that he suffered a physical injury as a result of the taser.  Instead, the Plaintiff claims that his nose was broken, and that his neck and back were injured, **solely** as a result of the efforts of G. Hanson, Kezar, and Lindgren, to physically

restrain him, **after** he had been tased – a claim that we will subsequently address.  See, Plaintiff's Memorandum in Opposition, supra at pp. 19, 33, 40.[14]

Given the lack of evidence to demonstrate an actual injury, the Plaintiff cannot sustain his claim of excessive force, with respect to the deployment of the taser gun. See, Daniels v. Reams, 2008 WL 2783462 at *3 (W.D. Ark., July 17, 2008)(granting Summary Judgment on pretrial detainee's claim of excessive force, where the plaintiff's medical records did not support his contention "that he sustained more than minimal injury in the Incident"); Wise v. Oglesby, 2007 WL 735499 at *10 (W.D. Ark., February 16, 2007)("[T]he de minimis nature of the injuries suffered by [the plaintiff-pretrial detainee] preclude his excessive force claim."), adopted, 2007 WL 756311 (W.D. Ark., May 7, 2007); Birdine v. Gray, 375 F. Supp.2d 874, 880 (D. Neb. 2005)(granting Summary Judgment on pretrial detainee's claim of excessive force, based upon use of stun guns, in part because the plaintiff did not suffer "any significant injury"); compare, Schumacher v. Halverson, 467 F. Supp.2d 939, 951 (D.

---

[14]In his unsworn response, the Plaintiff alleges that he warned the Defendants that the medications which were injected "would further damage his already damaged liver * * * ."  See, Plaintiff's Memorandum in Opposition, supra at p. 18.  However, he does not allege that the taser gun injured him.  In addition, the District Court has already dismissed the Plaintiff's claim relating the administration of medication, and the Plaintiff has not produced any evidence to support his claim of further liver damage.

Minn. 2006)(rejecting excessive force claim arising out of arrest, in part because "[t]he taser did not cause any permanent physical injuries, and did not require any medical or psychological treatment as a result of the incident.").

Accordingly, we recommend that Summary Judgment be granted, with respect to the Plaintiff's individual capacity claim against Van Schaick.[15]

> b.    Pennington County's Use of Force Policy.  Next, we turn to the Plaintiff's official capacity claim, which arises out of Pennington County's use of force policy.

In order to sustain a claim under Section 1983, a plaintiff must show that the named defendants were directly, and personally, involved in the illegal acts, or in the policy decision which created the unlawful context for those acts.  See, e.g., Beck v. LaFleur, 257 F.3d 764, 766 (8th Cir. 2001); McNair v. Norris, 210 F.3d 379, 2000 WL 490709 at *1 (8th Cir., April 27, 2000); Martin v. Sargent, 780 F.2d 1334, 1337 (8th

---

[15]As noted, the Plaintiff also alleges that the Kittson County Defendants violated his civil rights by observing Van Schaick's behavior, and failing to intervene. See, Complaint, supra at ¶197.  "A claim under Section 1983 against an officer for failure to intervene necessarily assumes another officer violated the plaintiff's constitutional rights."  Brown v. City of Bloomington, 280 F. Supp.2d 889, 894 (D. Minn. 2003), citing Putman v. Gerloff, 639 F.2d 415, 423-24 (8th Cir. 1981).  Here, having concluded that the Plaintiff's claim of excessive force as to Van Schaick fails as a matter of law, we also recommend that his failure to intervene claims, as to the other Defendants, be dismissed.

Cir. 1985).  Accordingly, the doctrine of <u>respondeat</u> <u>superior</u> is not available to a Section 1983 plaintiff.  See, e.g., <u>Monell v. Dep't of Social Servs.</u>, supra at 691; <u>Lux by Lux v. Hansen</u>, 886 F.2d 1064, 1067 (8th Cir. 1989); <u>Rasmussen v. Larson</u>, 863 F.2d 603, 605 (8th Cir. 1988).  Moreover, a warden's, or other official's, "'general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability."  <u>Keeper v. King</u>, 130 F.3d 1309, 1314 (8th Cir. 1997), quoting <u>Camberos v. Branstad</u>, supra at 176; see also, <u>Brisco-Wade v. Carnahan</u>, 149 F. Supp.2d 891, 899 (E.D. Mo. 2001).  Absent a showing of direct and personal involvement, the only other basis, upon which a plaintiff may state a claim against a defendant, is by demonstrating that the particular defendant failed to properly train, supervise, or control, the actions of a subordinate who invaded the plaintiff's rights.  See, <u>City of Canton v. Harris</u>, supra at 388; <u>Ruge v. City of Bellevue</u>, 892 F.2d 738, 739-40 (8th Cir. 1989); <u>Crooks v. Nix</u>, 872 F.2d 800, 804 (8th Cir. 1989).

Here, the District Court previously concluded that the Plaintiff had stated a <u>Monell</u> claim, arising out of the use of the taser gun.  See, <u>Order</u>, <u>Docket No. 69</u>, at 31.  In his Complaint, the Plaintiff alleges that Pennington County is liable for the

negligent retention of Van Schaick, and that Hruby is liable for the failure to train Van Schaick.  See, Complaint, supra at ¶¶57, 62.

A County can be liable, under Section 1983, if a plaintiff can prove that it has adopted some policy, custom, or practice, that caused a violation of the Plaintiff's Federal constitutional rights.  See, Lund v. Hennepin County, supra at 1125; City of Canton v. Harris, supra at 386-87; see also, Angarita v. St. Louis County, supra at 1546 ("A municipality may be held liable under Section 1983 only if a municipal custom or policy caused the deprivation of [a] right protected by the constitution or federal laws."); Williams v. Little Rock Municipal Water Works, supra at 223 ("[M]unicipal governments can be held liable for the acts of their employees in contravention of the civil rights of individuals only upon a showing that a 'policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers' is the motivating force behind the acts of those employees."), quoting Monell v. Dep't of Social Services, supra at 690.

Failure to properly train and supervise municipal employees can give rise to liability under Section 1983, but "'[o]nly where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or

custom' that is actionable under [Section] 1983.'"  <u>Gatlin ex rel. Estate of Gatlin v.</u>

<u>Green</u>, 362 F.3d 1089, 1094 (8th Cir. 2004), quoting <u>City of Canton v. Harris</u>, supra

at 389 [citations omitted].  As explained by our Court of Appeals:

> A city * * * may be liable for deficient policies regarding hiring and training police officers where (1) the city's hiring and training practices are inadequate; (2) the city was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice by a municipality,' * * * and (3) an alleged deficiency in the city's hiring or training procedures actually caused the plaintiff's injury. * * * It is necessary to show 'that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.' * * * In other words, the plaintiff must demonstrate that the city 'had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.

<u>Andrews v. Fowler</u>, 98 F.3d 1069, 1076 (8th Cir. 1996)(citations omitted).

Similarly, a supervisor "may be held individually liable * * * if a failure to properly

supervise and train the offending employee caused a deprivation of constitutional

rights."  <u>Vaughn v. Greene County</u>, supra, quoting <u>Wever v. Lincoln County, Neb.</u>,

388 F.3d 601, 606 (8th Cir. 2004).

Here, the Pennington County Defendants have submitted their official policy

on the use of force, including the use of electronic incapacitation devices, such as a

taser gun, as non-deadly force.  See, <u>Rowlette Aff.</u>, supra, Exhibit R at ¶¶21.1.08, 21.5.03.  The Policy permits the reasonable use of non-deadly force to "execut[e] any * * * duty imposed upon the public officer by law," <u>id.</u> at ¶21.3.01(d), but requires the officer to consider, in part, "whether the suspect poses an immediate threat to the safety of the officers or others[.]"  <u>Id.</u> at ¶21.3.02(b).  The Policy requires officers to "use the least amount of force reasonably necessary," <u>id.</u> at ¶21.4.01, but it specifically states that "[p]rotracted hand-to-hand combat may be harmful to * * * the safety of law enforcement personnel," <u>id.</u> at ¶21.4.02, and it does not require officers to "first attempt using types and degrees of force which reasonably appear to be inadequate to accomplish the intended objective."  <u>Id.</u> at ¶21.4.01.  In addition, "[a]n officer **may** announce to another his or her intention to use only that type and degree of force which may reasonably be necessary under the circumstances."  <u>Id.</u> at ¶21.4.06 [emphasis added].  The Policy further states that "[i]mpact weapons should [be] used only where efforts involving the use of less force have failed, or where it reasonably appears that such methods would be ineffective if attempted."  <u>Id.</u> at ¶21.5.01(a).  As noted, Van Schaick attests that he has received training on, and has taught, the use of force on a number of occasions.  See, <u>Van Schaick Aff.</u>, supra at ¶9.

We find no practicable difference between Pennington County's policy on the use of force, and the policy that was upheld in <u>Mattson v. Becker County</u>, 2008 WL 3582781 at *6 (D. Minn., August 12, 2008). In <u>Mattson</u>, the plaintiff claimed that the defendant's taser policy was unconstitutional, and that the defendant had failed to adequately train its officers on the use of a taser gun. <u>Id.</u>  However, the Court observed that, as here, the policy at issue limited the use of a taser gun to those "in situations where force is justified to control aggressive and/or combative/ noncompliant subjects, thereby reducing the likelihood of injury to officers and subjects." <u>Id.</u>  The plaintiff specifically argued that the defendant had failed to "instruct its deputies to use lesser force when possible." <u>Id.</u>  However, the Court declined to adopt the plaintiff's position, owing to his failure to cite any support for his argument that such a duty existed. <u>Id.</u>  After finding that the plaintiff had failed to address "why [the policy's] limitations and restrictions on taser use are factually or legally inadequate," whether through argument or citation to supporting case law, the Court granted Summary Judgment to the defendants, with respect to the plaintiff's <u>Monell</u> claim. <u>Id.</u>; see also, <u>Pipkins v. Pike County</u>, 2007 WL 1521714 at *2-3 (W.D. Ark., May 22, 2007).

We find that the Court's analysis, in <u>Mattson</u>, applies with equal force to the circumstances presented here.  The Plaintiff has not provided any cogent argument, nor any legal authority, which would demonstrate that Pennington County's policy is legally inadequate, with respect to limiting an officer's use of a taser gun. Moreover, the Plaintiff's claim of negligent retention, and training, continues to be nothing more than a vague and conclusory allegation -- he has not produced any evidence to demonstrate that Pennington County's training was inadequate, or that Van Schaick was negligently retained.   See, <u>Parrish v. Luckie</u>, 963 F.2d 201, 204 (8th Cir. 1992)("To establish a city's liability based on its failure to prevent misconduct by employees, the plaintiff must show that city officials had knowledge of prior incidents of police misconduct and deliberately failed to take remedial action."), citing <u>Harris v. City of Pagedale</u>, 821 F.2d 499, 504 (8th Cir. 1987), cert. denied, 484 U.S. 986 (1987); see also, <u>Szabla v. City of Brooklyn Park</u>, 486 F.3d 385, 392 (8th Cir. 2007)("So far as the record reveals, this was a one-time incident, and there is no evidence of a pattern of constitutional violations making it 'obvious' that additional training or safeguards were necessary.")[citation omitted]; <u>Turney v. Waterbury</u>, 375 F.3d 756, 762 (8th Cir. 2004)(plaintiff did not meet her burden to survive Summary Judgment, where she "simply asserts that Bennett County does not train its officers

well enough in suicide screening and prevention," but "[t]he county does, however, provide manuals that inform officers how to recognize and respond to suicide risks.").

Therefore, we recommend that the Pennington County Defendants be granted Summary Judgment as to the Plaintiff's official capacity claim in Count Ten.

      c.    <u>Physically Restraining the Plaintiff</u>.  Lastly, the District Court previously concluded that the Plaintiff had stated a claim for excessive force, based upon the alleged actions of G. Hanson, Kezar, and Lindgren, who physically restrained the Plaintiff at the NWMC, while hospital staff administered two (2) injections.  See, <u>Order</u>, <u>Docket No. 69</u>, at 31; see also, <u>Complaint</u>, supra at ¶¶73-89. The City Defendants now contend that they are entitled to Summary Judgment on this claim.  See, <u>City Defendants' Memorandum in Support</u>, <u>Docket No. 85</u>.  We agree.

Once again, the Plaintiff has failed to demonstrate a sufficient injury to support his claim of excessive force.  "[A] de minimis use of force or injury is insufficient to support a finding of a constitutional violation."  <u>Crumley v. City of St. Paul</u>, supra at 1007, citing <u>Hunter v. Namanny</u>, 219 F.3d 825, 831 (8th Cir. 2000).  Here, it is undisputed that G. Hanson, Kezar, and Lindgren, did not enter the secure room until after Van Schaick had tasered the Plaintiff.  Those officers then lowered the Plaintiff to a mattress, and held him down while NWMC staff administered two (2) injections.

However, the officers attest that they did not use any force to lower the Plaintiff onto the mattress.  Thus, the Record is undisputed that the officers used a de minimis amount of force.

The officers further attest that the Plaintiff did not complain of any injuries, during the course of the incident on December 29, 2004.  In his unsworn response, the Plaintiff alleges that the officers physically assaulted him, causing a broken nose, and a sprained neck and back.  See, <u>Plaintiff's Memorandum in Opposition</u>, supra at 19. However, the Plaintiff's allegations are not competently or credibly supported by the Record.  The Plaintiff has not submitted any competent evidence to support his claims of physical assault, nor do the Plaintiff's medical records support a conclusion that he was, in fact, injured by the officers' minimal efforts to physically restrain him.  See, <u>Daniels v. Reams</u>, supra at *3; <u>Wise v. Oglesby</u>, supra at *10; <u>Birdine v. Gray</u>, supra at 880.

In a grievance dated February 21, 2005, the Plaintiff did claim that his nose had been broken at the NWMC.  See, <u>Hultgren Aff.</u>, supra, Exhibits E and G.  However, on February 18, 2005, at a medical appointment with Dr. Larter, the Plaintiff reported that he had broken his nose in the past, see, <u>Rowlette Aff.</u>, supra, Exhibit N, and, in a subsequent appointment with Nupdal, on March 4, 2005, the Plaintiff again reported

that he had previously suffered an injury to his nose, but complained only of shortness of breath, and coughing episodes. See, <u>Dalzell Aff.</u>, supra, Exhibits B-C. The Plaintiff did not complain of any serious injury to his nose, nor did he mention any injury to his neck or back. Accordingly, Nupdal prescribed a conservative course of treatment, by way of a steroid nasal spray, and he advised the Plaintiff that smoking could contribute to his breathing problems. <u>Id.</u>

As a result, the Plaintiff has not demonstrated a sufficient injury to support his excessive force claim, against G. Hanson, Kezar, and Lindgren, for their efforts to physically restrain him. See, <u>Wertish v. Krueger</u>, supra at 1067; <u>Andrews v. Fuoss</u>, supra at 818. Accordingly, we conclude that the Plaintiff's excessive force claim fails as a matter of law, and we recommend that the City Defendants be granted Summary Judgment.

In sum, we recommend that the Defendants' Motions for Summary Judgment be granted, in their entirety.

NOW, THEREFORE, It is --

RECOMMENDED:

1.      That the Motion of the City Defendants for Summary Judgment [Docket No. 83] be granted.

2.      That the Motion of the Kittson and Pennington County Defendants for Summary Judgment [Docket No. 92] be granted.


Dated:  January 20, 2009                    *s/Raymond L. Erickson*
                                            Raymond L. Erickson
                                            CHIEF U.S. MAGISTRATE JUDGE


## NOTICE

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties **by no later than February 3, 2009**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete

transcript of that Hearing by no later than **February 3, 2009**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.